Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JEAN W., ALEXIS R., and ANTHONY R.<br><br>Plaintiffs,<br><br>vs.<br><br>BEACON HEALTH OPTIONS, and the SHELL OIL COMPANY COMPREHENSIVE WELFARE BENEFITS PLAN.<br><br>Defendants. | COMPLAINT<br><br>Case No. 2:21-cv-00469 - DBP |

Plaintiffs Jean W. ("Jean") Alexis R. ("Alexis") and Anthony R. ("Anthony"), through their undersigned counsel, complain and allege against Defendants Beacon Health Options ("Beacon") and the Shell Oil Company Comprehensive Welfare Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Jean, Alexis, and Anthony are natural persons residing in Harris County, Texas. Alexis and Anthony are Jean's children.

1

2. Beacon is an insurance company headquartered in Boston, Massachusetts and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Jean was a participant in the Plan and Alexis and Anthony were beneficiaries of the Plan at all relevant times. Jean, Alexis, and Anthony continue to be participants and beneficiaries of the Plan.

4. Alexis received medical care and treatment at Echo Springs Center ("Echo Springs") from August 1, 2019 to December 31, 2019. Anthony received treatment at Return to Excellence Academy ("Excellence Academy") from June 19, 2019, to March 31, 2020. These are transitional living facilities which provide sub-acute inpatient treatment to individuals with mental health, behavioral, and/or substance abuse problems. Echo Springs and Excellence Academy are located in Idaho

5. Beacon and the Plan denied claims for payment of Alexis and Anthony's medical expenses in connection with their treatment at Echo Springs and Excellence Academy.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because Beacon does business in Utah and across the United States. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### ALEXIS

9. Alexis was admitted to Echo Springs on August 1, 2019.

10. In an Explanation of Benefits ("EOB") statement dated April 23, 2020, Beacon denied payment under the justification that the service billed was not covered and asked Jean to refer to the Mental Health, Substance Abuse, and Expenses not Covered provisions of the Summary Plan Description.

11. On July 21, 2020, Jean submitted a level one appeal of the denial of payment for Alexis's treatment. Jean reminded Beacon of its responsibilities under ERISA including its obligation to take into account all of the information she provided, to use appropriately qualified reviewers, to provide her with a full, fair, and thorough review of the denial, to act in her best interest, and to give her the information necessary to perfect the claim.

12. Jean argued that the treatment at Echo Springs was a covered benefit under the terms of the Plan. She contended that there was no listed exclusion for the transitional behavioral health treatment provided to Alexis.

13. She wrote that Beacon's denial provided little to no explanation regarding why it had elected to deny payment, which made it difficult for her to effectively appeal the denial.

She stated that she had reviewed the Mental Health, Substance Abuse, and Exclusions section of the Plan but had not come across anything which led her to believe that Echo Springs was not a covered benefit.

14. Jean wrote that under MHPAEA, insurers were required to offer coverage for behavioral health benefits "at parity" with comparable medical or surgical benefits. She identified skilled nursing, rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the behavioral health treatment Alexis received. She stated that MHPAEA prohibited insurers from imposing treatment limitations "that do not also generally apply to medical and surgical benefits."

15. Jean asked Beacon to conduct a MHPAEA compliance analysis to assess whether or not the Plan was compliant with MHPAEA and to provide her with physical copies of the results of this analysis. She stated that she was entitled to this information under MHPAEA.

16. On August 17, 2020, Beacon upheld the denial of payment for Alexis's treatment. The letter stated in part:

> Beacon is upholding the initial determination to deny the billed claims because supervised living services, [sic] are not a covered benefit under your plan. As listed in the SPD, pages 21 and 193, custodial care may also include supervised living arrangement, [sic] is not covered, [sic] except in conjunction with hospice care.

17. On September 23, 2020, Jean submitted a level two appeal of the denial of Alexis's treatment. She argued that Beacon had not respected her rights under ERISA and, among other things, appeared to have evaluated the claim using an appeals and grievances coordinator, "with no medical, psychological, or professional" credentials. Jean

4

questioned how she was supposed to receive a fair review if Beacon refused to utilize "appropriately qualified staff" to conduct the reviews.

18. Jean contended that Alexis's treatment did not qualify as custodial care. She quoted the summary plan description's definition of custodial care and noted that it dealt with types of care designed primarily to assist an individual in completing "activities of daily living". She quoted examples from the summary plan description such as assistance with feeding, bathing, getting out of bed, or getting dressed. Jean argued that the services provided at Echo Springs in no way met this definition.

19. Jean wrote that Beacon continued to violate MHPAEA. She again argued that intermediate level medical or surgical services such as skilled nursing care were the appropriate analogues to Alexis's treatment and cited to a court decision in *Johnathan Z. v Oxford Health Plans* to support this allegation. She contended that Beacon was treating its mental health treatment in a more restrictive manner than analogous medical or surgical treatment. She again asked Beacon to perform a parity compliance analysis and to provide her with physical copies of the results of this analysis.

20. In a letter dated March 10, 2021, the Plan upheld the denial of payment for Alexis's treatment. The letter stated in part:

> We have carefully considered the totality of the administrative record and applied the terms of the Plan that apply to your request for review in arriving at our final determination of your benefits. Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the federal law that governs this plan, we are required to administer the Plan in accordance with it written provisions and terms. As such, we have determined that the submitted charges are not eligible for reimbursement by the Plan.
>
> The documents provided do not reflect that medical treatment was provided to Alexis by Echo Springs. The only documentation recording Alexis's activities and the services provided for her while at Echo Springs are the Progress Notes indicated in item 1 above. The Progress Notes do not identify the author's name

or credentials, which significantly limits their probative value, and there is no description of psychotherapy sessions or other treatment provided to Alexis by a licensed mental health care provider at Echo Springs. Based on the documentation provided, including the Progress Notes, the services performed for Alexis at Echo Springs included academic classes and tutoring, life skills classes and support, group exercise and recreation, which would not be eligible for reimbursement under any circumstances under our Plan. …

You asserted that the room, board and other services Alexis received at Echo Springs should be treated as covered services based on applying either the skilled nursing facility care or hospice care framework in parity to the services provided by Echo Springs. We were prepared to review the merits of your parity claim. However, even if we were to agree that skilled nursing facility care or hospice care is the appropriate analog in the medical/surgical context to the services provided at Echo Springs, you did not submit information sufficient for us to verify that the billed charges would be covered if we were to apply Section 1.4f (describing skilled nursing facility care) or Section 1.4g (describing hospice care) of the Summary Plan Description by analogy to the services Alexis received.

The claim bundles billed charges for all services Echo Springs provided under code 1003 "supervised living", which is an exclusion from the Plan. Despite our requests you have not submitted an itemized bill to allow us to assess the eligibility for reimbursement of any portion of the services provided to Alexis by Echo Springs. Without an itemized bill, we do not have an objective basis to pay benefits for certain of the bundled services even if they were adequately documented and determined to be eligible for reimbursement under the Plan by analogy to skilled nursing facility or hospice care. …

As stated above, the Plan cannot pay benefits if it cannot confirm the charges are eligible under the governing Plan documents. For the foregoing reasons, the Plan is denying your appeal for benefits.

## ANTHONY

21. Anthony was admitted to Excellence Academy on June 19, 2019.

22. In a letter dated December 12, 2019, Beacon denied payment for Anthony's treatment at Excellence Academy. Beacon wrote that the denial was issued because, "**The facility is not licensed by the state for Residential Treatment Center.**" [sic] (emphasis in original)

23. On May 5, 2020, Jean submitted a level one appeal of the denial of Anthony's treatment. Jean reminded Beacon of its responsibilities under ERISA, including its obligation to act in her best interest. She wrote that Beacon's denial was lacking in detail and could have been written for another patient entirely.

24. Jean contended that Excellence Academy was a transitional living facility and was not a traditional residential treatment facility. She stated that Beacon should have been aware of this fact and questioned how thoroughly her claim had been reviewed if Beacon had classified it as a residential facility. She wrote that Excellence Academy was not licensed because the State of Idaho did not issue licenses for transitional facilities.

25. She contended that Anthony's treatment was medically necessary and had been recommended by his physician. She again stated that MHPAEA required insurers to administer benefits for mental healthcare, like the transitional treatment Anthony received, in a manner comparable to the administration of analogous medical or surgical benefits. She asked Beacon to conduct a parity analysis to assess the Plan's MHPAEA compliance and to provide her with physical copies of the results of this analysis.

26. In a letter dated June 9, 2020, Beacon upheld the denial of payment for Anthony's treatment. The letter stated in part:

> On 12/12/19, Beacon's initial administrative determination under authorization number 01-100219-7-14 was not rendered for another patient, nor did Beacon fail to provide a full and fair review. The facility in question, Center for Excellence dba Return to Excellence, initially billed claims to Beacon for Revenue Code 1001, (Residential Treatment – Psychiatric), which implies that RTC services were rendered. After a thorough review of the facilities' [sic] licensure, Beacon validated that the provider, Center for Excellence and its affiliated business name was not licensed by the state as a [sic] RTC facility. In review of the SPD, page 12 the benefit plan specifically requires that any provider of mental health or substance use services be "qualified and licensed". Therefore, the denial was correct as the facility billed for RTC services, although it is not licensed to provide the service.

> After the initial determination was issued, the facility billed corrected claims for Revenue Code 1003 (Supervised Living). For the reasons listed below, Beacon is upholding the initial determination to deny the billed claims because supervised living services, are not a covered benefit under your plan. Listed in the SPD, pages 21 and 193, custodial care may also include supervised living arrangement, [sic] is not covered, except in conjunction with hospice care.

27. On July 31, 2020, Jean submitted a level two appeal of the denial of Anthony's treatment. Jean argued that Beacon had not complied with its obligations under ERISA and in particular, had not provided her with the majority of the documents she had requested, nor had it conducted a MHPAEA compliance analysis as she had asked. She stated that Beacon's vague assurances that it complied with ERISA and MHPAEA were not enough to satisfy its obligations under those statutes. She wrote that if Anthony had received services in a medical or surgical facility rather than behavioral healthcare treatment, they would have been approved.

28. She argued that Beacon had not used an appropriately qualified reviewer, nor had it given her the information necessary to perfect the claim. Jean contended that these errors were not inadvertent but were, "maliciously committed… out of financial self-interest."

29. Jean again argued that the services Anthony received were a covered benefit under the terms of the Plan. She stated that Anthony did not receive custodial care services and quoted the Plan's definition of these services, which equated custodial care with assistance performing activities of daily living such as eating, bathing, or using the bathroom.

30. In a letter dated December 7, 2020, the Plan partially overturned the denial of benefits for Anthony's treatment. The Plan determined that the individual psychotherapy sessions would be treated as a covered benefit, but the remaining services would not be covered. The letter stated in part:

> We have determined that the itemized charges for individual psychotherapy sessions totaling $26,775.00, are eligible for reimbursement by the Plan. …
>
> With respect to the remainder of the billed charges, you asserted that the room, board and other services Anthony received at Return to Excellence Academy should be treated as covered services based on applying either the skilled nursing facility care or hospice care framework in parity to intermediate-level mental health care provided at a transitional living facility. We were prepared to review the merits of your parity claim. However, even if we were to agree that skilled nursing facility care or hospice care is the appropriate analog in the medical/surgical context to the transitional living/intermediate mental health care provided at Return to Excellence Academy, you did not submit information sufficient for us to verify that the billed charges would be covered if we were to apply Section 1.4f (describing skilled nursing facility care) or Section 1.4g (describing hospice care) of the Summary Plan Description by analogy to the services Anthony received.
>
> The invoice you submitted does not itemize any charges beyond the individual psychotherapy sessions. …
>
> It is clear that at least a portion of the bundled charges (i.e., academic support, work skills, healthy life skills and recreation) would not be eligible for reimbursement under any circumstances under our Plan. Without an itemized bill, we do not have an objective basis to pay benefits for certain of the bundled services (i.e., room and board, personal health support) even if they were determined to be eligible for reimbursement by analogy to skilled nursing facility care or hospice care. As stated above, the Plan cannot pay benefits if it cannot confirm the charges are eligible under the governing plan documents.

31. On January 28, 2021, Jean submitted a response to the final benefit determination. She stated that the denial rationale had been changed from a supervised living exclusion to a new unrelated denial, which forced her to draft this letter to address the newly raised justification for denying care.

32. She stated that Beacon and the Plan had ignored her statements concerning custodial care and continued to rely on denial rationales which were not applicable. She wrote that Beacon had requested an itemized bill which she termed as "wholly inappropriate" as she was "entitled to due process regarding the full, bundled charges." Jean wrote that this

9

request to unbundle claims may have constituted a MHPAEA violation in and of itself, as Beacon did not appear to do this for analogous medical or surgical care.

33. She argued that it was also inappropriate for the defendants to request documents concerning medical necessity when this was not ever listed as a justification for the denial of coverage. She contended that Beacon's inability to conduct a simple parity analysis was "absolutely baffling." She took issue with the Plan's statement in the denial letter that "you did not submit information sufficient for us to verify that the billed charges would be covered [under MHPAEA]."

34. She contended that it was inappropriate for the Plan to make such an assertion, as the Defendants, "are in sole possession of all information pertaining to the standards and procedures used to process all claims." She argued that it was nonsensical for the Plan to state that it could not perform a MHPAEA analysis and blame her for not submitting materials that it had failed to provide on multiple occasions and retained in its sole possession.

35. She again asked for a parity analysis to be performed and that she be provided with specific details regarding:

    1) the specific plan language regarding the above limitation and identify all of the medical/surgical and mental health and substance use disorder benefits to which it applies (or does not apply) in the relevant benefit classification;
    2) the factors used in the development of the limitation;
    3) the evidentiary standards used to evaluate the factors;
    4) the methods and analysis used in the development of the above limitation; and
    5) any evidence and documentation to establish that the limitation is applied no more stringently, as written and in operation, to mental health and substance use disorder benefits than to medical and surgical benefits.

36. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

37. The denial of benefits for Alexis and Anthony treatment was a breach of contract and caused Jean to incur medical expenses that should have been paid by the Plan in an amount totaling over $170,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

38. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Beacon, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

39. Beacon and the Plan failed to provide coverage for Alexis's treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

40. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

41. Jean alleged that Defendants couched their denials in language such as an exclusion for "custodial care." However, when Jean quoted the relevant plan language and demonstrated that it did not apply, she argued that Defendants abandoned this rationale without addressing her arguments and denied payment based on new arguments.

42. Jean contended that Defendants violated ERISA in other respects as well, such as utilizing unqualified reviewers and largely ignoring her requests for documents. Jean

attributed these decisions as an intentional dereliction of Defendants' fiduciary duty in an attempt to protect their financial bottom line.

43. Beacon and the agents of the Plan breached their fiduciary duties to Alexis and Anthony when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Plaintiffs' interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Plaintiffs' claims.

44. The actions of Beacon and the Plan in failing to provide coverage for Plaintiffs' medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

45. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Beacon's fiduciary duties.

46. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

47. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also

makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

48. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

49. The medical necessity criteria used by Beacon for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

50. In each of her appeals Jean requested to be provided with specific documents including: all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, the Plan's skilled nursing, inpatient rehabilitation, hospice, and Beacon's other medical/surgical or mental health disorder criteria regardless of whether it was used to evaluate the claim.

51. Jean also asked for any reports from any physician or other professional related to the claim, as well as the names, qualifications, and denial rates of the individuals who assessed the claim. Jean stated that it was essential for Beacon to provide these items so that she could assess the Plan's MHPAEA compliance. She also directed Beacon to

forward her request to the appropriate entity if it were not in possession of these documents or was not acting on behalf of the Plan in this regard.

52. Beacon and the Plan partially complied with the Plaintiffs' request for documents and did produce items such as the summary plan description, however Jean was not provided with the majority of the items she requested, nor did Beacon and the Plan conduct a MHPAEA compliance analysis as Jean requested.

53. Jean argued that Beacon had not substantively acknowledged her claims concerning MHPAEA, and that while the Plan did respond to her argument that it violated MHPAEA, it stated she had not provided it with the necessary documents to conduct a MHPAEA analysis.

54. Jean asserted that the reason she had not produced these documents was that they remained in Defendants' sole possession. She stated that she had repeatedly asked for documents which would allow her to more fully argue a violation of MHPAEA but had not been provided with sufficient documentation.

55. Jean identified hospice care as one of the medical or surgical analogues to the transitional treatment Alexis and Anthony received. Defendants denied payment in part due to an exclusion for "custodial care." Defendants then stated that custodial care was excluded by the Plan except in the case of hospice care. Jean disputed that the Plaintiffs received custodial care while in treatment, however, Defendants' blanket exclusion for custodial care in the mental health realm while offering a specific exception for custodial care for hospice patients is a violation of MHPAEA as it constitutes a treatment limitation which is only universally applied to behavioral health services.

56. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Alexis and Anthony's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Beacon exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

57. When Beacon and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Beacon and the Plan evaluated Alexis and Anthony's mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

58. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment Jean stated that she had been requested to provide an itemized bill of the services Alexis and Anthony received instead of evaluating the service as a whole. Jean contended that Defendants do not engage in such piecemeal evaluation of comparable medical or surgical care.

59. Additionally, the actions of Beacon and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar

restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

60. Defendants' denied payment in large part because the transitional living facilities in question were not licensed, however Defendants' do not appear to universally impose such a requirement on analogous medical or surgical care such as skilled nursing facilities. Defendants often impose a requirement for individual staff to be licensed in the medical or surgical realm but place no such restriction on the facilities themselves.

61. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Beacon, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

62. The violations of MHPAEA by Beacon and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

63. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Alexis and Anthony's medically necessary treatment at Echo Springs and Excellence Academy under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day of July, 2021.

By     s/ Brian S. King

                                                       Brian S. King  
                                                       Attorney for Plaintiffs

County of Plaintiffs' Residence:  
Harris County, Texas.